STATE of Wisconsin, Plaintiff-Respondent,

v.

Timothy R. STANKUS, Defendant-Appellant.†

Court of Appeals

*No. 97–2131–CR. Submitted on briefs April 24, 1998.—Decided May 20, 1998.*

(Also reported in 582 N.W.2d 468.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven J. Watson* of Elkhorn.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Susan M. Crawford*, assistant attorney general.

Before Snyder, P.J., Brown and Anderson, JJ.

BROWN, J. At issue in this case is the validity of the consent given to police officers to search an automobile during a routine traffic stop. Timothy R. Stankus alleges that the police employ a procedure designed to create a coercive atmosphere affecting a person's ability to freely decide whether to consent to a search of a car. That procedure is to suddenly place one officer at the passenger side of the car to assist the other officer, who is positioned at the driver's side, just prior to asking for consent. Stankus further argues that even if his initial consent is deemed by us to be voluntary, it did not include permission to search the trunk. Based on

our review of the record, we conclude that Stankus' consent was voluntary and uncoerced. Moreover, because the officer seized suspected contraband concealed under the front seat of the car during the initial portion of the search, he had probable cause to search the trunk. We affirm.

Stankus was charged with possession of a short-barreled shotgun contrary to § 941.28(2) and (3), STATS. He filed a motion to suppress the evidence (the shotgun), arguing that his consent was not voluntary, and if it was voluntary, he did not consent to a search of the trunk. An evidentiary hearing followed where the trial court established the following facts.

At approximately 8:30 p.m. on May 30, 1996, a village police chief and his sergeant were in a marked squad car while patrolling a mixed residential and business area when they observed an automobile with a burnt out headlamp. Both officers were in uniform and armed. After they stopped the vehicle, the sergeant approached the driver's side of the automobile. The chief remained in the squad car.

The sergeant informed the driver that he had been stopped for driving with a burnt out headlamp and asked him for his driver's license. The driver gave his driver's license and the sergeant returned to the squad car, where he followed standard procedure by checking whether the license was valid and if there were any outstanding arrest warrants. The driver was identified as Stankus. Dispatch confirmed that the driver's license was valid and there were no outstanding warrants.

The sergeant, however, was suspicious and he wanted to search Stankus' vehicle. He had observed an unusual amount of fast-food wrappers, packs of cigarettes, soda cans and other debris on the floor of

Stankus' car, and in his experience, this was an indication that the car might contain illegal drugs.[1] So he advised the chief that he was going to ask Stankus for his consent to search the vehicle and both officers then exited the squad car. The chief approached the car on the passenger's side, while the sergeant again walked up to the driver's side. Neither officer had his weapon drawn. The sergeant then asked Stankus if "he had any guns, drugs, or anything illegal in the vehicle," to which Stankus responded, "[N]o." The sergeant then asked if he "could go ahead and take a look through the vehicle." Stankus replied, "Sure. Go ahead."

The sergeant then asked Stankus and a passenger, Stankus' fiancee, to exit the car and stand with the chief on the curb near the car. The sergeant testified that as Stankus exited the car, he told him he would find nothing illegal and that "[y]ou can even look in the trunk." Stankus also told the sergeant that the trunk did not open.

The sergeant began his search by looking under the driver's seat, where he found a large clear plastic baggy containing a white powdery substance. The sergeant did not ask Stankus what the substance was, and he did not open the bag or conduct any field testing to identify the substance. However, based on its location, packaging and appearance, the sergeant suspected

---

[1] This is a consent case, not a *Terry* search case. *See Terry v. Ohio*, 392 U.S. 1 (1968). We therefore are not called upon to determine whether the messy interior of a car justifies a belief that the operator might have drugs in the vehicle. We observe, however, that there are many rather disorganized citizens in this state whose lifestyles extend to how they care for the passenger compartments of their cars. They might be surprised to learn that some officers of the law consider vehicles filled with clutter to be prime candidates for containing illegal drugs.

236

that the bag contained cocaine, and he placed both Stankus and his fiancee under arrest. They were then handcuffed and placed in the back seat of the squad car.

The sergeant then resumed his search and tried to open the trunk with the car key. But Stankus' statement that the trunk did not open proved correct, and the sergeant bent the key as he tried to unlock the trunk. The sergeant then discovered that he could access the trunk by folding down the back seats to the hatch area. During his examination of the trunk, he found a gym bag and a pair of lead-cast brass knuckles. When he opened the gym bag, he discovered a sawed-off, twelve-gauge shotgun. The plastic bag later proved to contain flour.

At the conclusion of the hearing, the trial court found that Stankus' consent was voluntary and its scope was not limited so as to exclude a search of the trunk. Moreover, the trial court concluded that even if Stankus did not consent to a search of the trunk, the search was nonetheless valid as being based on probable cause to believe that a crime had been committed. Stankus subsequently pled no contest and the trial court sentenced him to seven days in jail and eighteen months' probation. His motions for postconviction relief were also denied. On appeal, Stankus reasserts his arguments.

For a search pursuant to consent to be constitutionally permissible, the consent must be voluntary under the totality of the circumstances and not the product of duress or coercion, express or implied. *See State v. Rodgers,* 119 Wis. 2d 102, 114, 349 N.W.2d 453, 459 (1984). If the State relies on consent for the search, it has the burden of proving by clear and convincing

evidence that consent was voluntarily given. *See id.* Although the trial court's findings of fact will not be disturbed unless they are clearly erroneous, *see State v. Garcia,* 195 Wis. 2d 68, 75, 535 N.W.2d 124, 127 (Ct. App. 1995), the application of these facts to constitutional principles is a question of law subject to our de novo review, *see State v. Xiong,* 178 Wis. 2d 525, 531, 504 N.W.2d 428, 430 (Ct. App. 1993).

As stated above, Stankus asserts the same two arguments challenging the validity of his consent that he raised before the trial court. First, Stankus claims that his consent to search the car was tainted by an illegal detention and coercion and was therefore involuntary. Second, Stankus asserts that even if his initial consent was voluntary, he did not consent to a search of the trunk. We address them in turn.

"Voluntariness" is an elusive standard impervious to concise articulation, and the criteria for voluntariness reflect a balancing of competing values implicated in police questioning of a suspect. *See Rodgers,* 119 Wis. 2d at 122, 349 N.W.2d at 463 (Abrahamson, J., dissenting). In order to preserve the safety and security of the community, the police need to be able to seek the cooperation of and ask questions of individuals. To unduly restrict effective law enforcement would only serve to lessen our security. *See id.* at 123, 349 N.W.2d at 463. Thus, courts have recognized that to preserve our safety and security, "stealth and strategy are necessary weapons in a police officer's arsenal." *See id.* (quoted source omitted). To this end, the community has a real interest in encouraging consent to facilitate law enforcement activities. *See id.* At the same time, citizens have a liberty interest in conducting their business free from unreasonable prying into their personal affairs. The criminal law cannot be used as an instru-

ment of unfairness, and law enforcement officials should maintain a high standard of conduct. *See id.* at 123–24, 349 N.W.2d at 463. So an officer has a right to ask for consent to search and the individual has a right to say no. The point at which the consent is deemed to have been coerced is when the right to say no to a search is compromised by an official show of authority. Consent must be received, not extracted. *See State v. George,* 557 N.W.2d 575, 579 (Minn. 1997).

Here, Stankus insists that his initial consent, though unequivocal, was involuntary because both the sergeant and the chief approached the car just prior to his being asked to consent. It is not the presence of two officers that he finds problematic, however, but the fact that only one officer approached the car for the headlamp violation, while both officers approached the car to request consent for the search. Had both officers originally approached the car, claims Stankus, there would have been no problem with both officers also approaching the car to ask for consent. But by confronting him with two officers when asking for consent, the police created an atmosphere in which reasonable persons would believe that the police were about to embark on an endeavor for which cooperation of the individual was demanded. In sum, he contends that a subtle but calculated show of authority by the police created a coercive environment in order to secure his consent.

The State argues that the mere presence of two officers when asking for consent is not inherently coercive. It further contends that the totality of the circumstances provides no evidence that either officer did anything to coerce Stankus' consent. We agree.

The mere fact that two officers, rather than one, confronted Stankus does not create a situation which is

per se coercive. *See State v. Nehls,* 111 Wis. 2d 594, 599–600, 331 N.W.2d 603, 606 (Ct. App. 1983) (presence of officers in the home was not a basis to find coercion); 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE, § 8.2(b), at 644 (3rd ed. 1996). The number of officers, by itself, does not conclusively show coercion. *See id.* It is but a factor. Stankus must show other factors in addition. *See id.* To highlight this point, we need only examine the same Minnesota case, *State v. George,* which Stankus cites to support his argument that the presence of two officers was coercive. There, the police stopped a motorcyclist for a traffic violation. *See George,* 557 N.W.2d at 576. The driver was confronted by two officers and, after questioning, he consented to a search which revealed illegal weapons and drugs. *See id.* at 576–77. The court held that there was no valid consent.[2] *See id.* at 581. But the presence of two officers was only one factor in the court's decision. *See id.* Another factor the court considered was that the driver was uninformed about his right not to consent. *See id.* More importantly, the court noted that each response to the officers' questions led to additional and intimidating queries. The questions were not geared toward asking the driver to freely consent. And the driver's responses appeared to be an attempt to fend off a search with equivocal responses. *See id.* Although the driver did eventually give his consent, the court determined that it was more a mere acquiescence or submission to the officers' requests to search as a result

---

[2] The court initially held that the officers did not have a legally valid reason for stopping the vehicle, therefore invalidating the subsequent search. *See State v. George,* 557 N.W.2d 575, 579 (Minn. 1997). Although this ruling could have ended the case, the court nonetheless addressed the issue of consent. *See id.*

of the intimidating circumstances than a statement of unequivocal and voluntary consent. *See id.*

In the present case, we hold that under the totality of the circumstances, the State carried its burden of proving that Stankus voluntarily consented to the search. The stop was legally valid and not unreasonably long—only five to ten minutes elapsed from the time Stankus was stopped to the time he was asked for consent to search the car. Moreover, we are not convinced that the chief's action of approaching the passenger side of the car just prior to the sergeant asking for permission to search created a coercive atmosphere, thereby poisoning Stankus' consent. Neither officer had his weapon drawn. They did not make any promises or threats or use deception in order to gain Stankus' consent. Nor did they raise their voices. Unlike the driver in *George,* Stankus was not the subject of repeated intimidating questioning by the officers. The sergeant asked Stankus two simple questions: Whether "he had any guns, drugs, or anything illegal in the vehicle," and if he "could go ahead and take a look through the vehicle." Nothing in the record indicates that the tone or phrasing of the officer's questions conveyed a message that compliance with the request was mandatory. Importantly, unlike *George,* Stankus' consent to the sergeant's request cannot be characterized as equivocal. His unequivocal reply to the officer's query was, "Sure. Go ahead."

Stankus, however, refers us to the sergeant's testimony that the only reason he asked the chief to get out of the car was because he planned to ask for consent. Further, he highlights the sergeant's statement that in his experience no one had ever refused consent when both he and the chief approached a vehicle. In Stankus'

view, this demonstrates how the police tactic of having two officers approach a car to ask for permission to search places drivers in a situation where they are pressured to consent. Otherwise, he theorizes, why would it be infallible? The repeated decisions by drivers to consent to a search under these conditions, concludes Stankus, can only be explained by the assumption that they believed they had a legal duty to do so and that the village police intended for this mindset to occur.

The State argues that we should ignore the sergeant's testimony that he has never failed to secure consent when both he and the chief have approached a vehicle. It notes that "[a]t the suppression hearing, the trial judge ruled the question and answer which elicited this information was irrelevant" to the question of voluntariness. We disagree with this ruling. Relevant evidence is any evidence that has the tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* § 904.01, STATS. The fact that the sergeant's use of this particular procedure has never failed to secure consent is a probative building block from which one could argue for an inference that the police department intended to create a coercive atmosphere by means of official police procedure. It is therefore relevant to the issue of voluntariness.

But just because the sergeant has never failed to gain consent by employing that procedure does not mean he purposefully uses the tactic to create a coercive atmosphere. And it does not mean that a coercive atmosphere is thereby created. The sergeant may well ask the chief to come alongside the passenger side of a car when for a reason completely divorced from an

intent to create a coercive atmosphere. Traffic stops are fluid, unpredictable situations which can become dangerous. Police officers should therefore be permitted to employ reasonable measures they feel are necessary to both control the situation and ensure their safety. On the facts before us, we cannot say that the official policy of having one officer situated by the driver's side of a car and another officer situated by the passenger side creates or is intended to create a coercive environment. To rule otherwise would only serve as an undue restriction on law enforcement.

Instead of looking at how a police procedure might be viewed by some as being a disguised attempt to create a coercive atmosphere, we must look at how the person being asked to consent will view the situation. That is what we have done in an earlier portion of our discussion and the result is that a reasonable person in Stankus' position could not credibly believe that his free will to accept or reject the sergeant's request was compromised.

Stankus raises two other points in an effort to obtain a different result. He notes testimony in the record that he was nervous and scared when he gave his consent. He also notes his testimony that he had no knowledge and neither officer informed him of his right to refuse consent. Neither of these facts changes our conclusion that the consent was voluntary. Even if Stankus was nervous, his conduct and words were unambiguous and his consent unequivocal. And, although it is true that the officers did not apprise Stankus of his right to refuse consent, the law is that a police allocution of this nature is not a prerequisite to a valid consent. Knowledge of a right to refuse is not an indispensable element of a valid consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 246–47

(1973). It is but one more factor for a court to consider. We do not think it is an important factor in the present case. Stankus was twenty-nine years old at the time and was working on his college degree. He is a mature and educated adult plainly capable of a knowing consent. *See United States v. Mendenhall,* 446 U.S. 544, 558 (1980). This is therefore not a case in which the police used "unfair" methods to secure consent. Given the totality of the circumstances, we conclude that the police conduct was reasonable and Stankus' consent was received, not extracted.

Next, Stankus argues that he did not consent to a search of the trunk of the automobile. He points out that when he told the police "[y]ou can even look in the trunk," he also told them that the trunk did not open. According to Stankus, these two statements taken together represent an attempt on his part to restrict the scope of the search. We cannot agree. Stankus' initial statement that "[y]ou can even look in the trunk," unequivocally gave the police explicit consent to search the trunk. His statement that the trunk did not open in no way restricted his initial consent. Instead, his statement can easily be interpreted as informing the police that the normal method of entry was unavailable, but if they could figure out a way into the truck, they were free to search. The trial court's finding that Stankus gave the police permission to search the trunk is not clearly erroneous.

Moreover, even if we assume that Stankus did not consent to a search of the trunk, we would nonetheless uphold the seizure. The officer's discovery of suspected contraband (cocaine) in a clear plastic bag hidden under the front seat of the car gave him probable cause to believe that the car contained contraband. Stankus

disagrees. He points out that the bag contained flour. Further, although the officer was unfamiliar with cocaine, he could have readily verified his suspicions by field testing the substance. The officer's conclusion that the substance was cocaine, concludes Stankus, was therefore hasty, imprudent and insufficient to support probable cause.

■

Probable cause exists when a reasonable person could conclude that the defendant has committed or is in the process of committing a crime. *See State v. Pozo,* 198 Wis. 2d 705, 710–11, 544 N.W.2d 228, 230–31 (Ct. App. 1995). It is a flexible, common-sense standard to be viewed from the standpoint of the experience and training of the officer seizing the evidence. *See id.* at 711–12, 544 N.W.2d at 231.

■

Here, the sergeant concluded—based on his past training and experience—that the white powdery substance was cocaine. We agree with the trial court that under the circumstances this was not an unreasonable conclusion. The sergeant had never touched cocaine before and therefore was unfamiliar with the differences in texture between cocaine and flour. However, he testified that based on his police training, the white powdery substance fit the description of cocaine. We disagree with Stankus that his conclusion was hasty or imprudent. Powdered cocaine is a white substance, and it is commonly transported in clear plastic bags. More importantly, the sergeant found the bag hidden underneath the front seat of the car. It is not unusual for officers to find drugs hidden from view under the seat of a car. Flour, by contrast, is typically not stored or transported in a clear plastic bag concealed underneath the driver's seat of an automobile. Although the

sergeant did not test the substance at the scene, given his unfamiliarity with the drug along with the location, packaging and appearance of the bag, it was reasonable for him to conclude that the substance was cocaine, not flour.

When police have probable cause to believe that a vehicle contains evidence of a crime, they are allowed to conduct a warrantless search of the vehicle without a showing of exigent circumstances. *See State v. Tompkins,* 144 Wis. 2d 116, 130, 423 N.W.2d 823, 829 (1988); *United States v. McGuire,* 957 F.2d 310, 314 (7th Cir. 1992). Because he had probable cause, the sergeant had the authority to search every part of the vehicle, including the trunk. *See McGuire,* 957 F.2d at 314. We affirm the trial court's finding that the shotgun was seized pursuant to a lawful search of the car.

*By the Court.*—Judgment and order affirmed.

ANDERSON, J. *(concurring).* The result we reach today is ordained by decisions from the United States and Wisconsin Supreme Courts. I write separately to address the significant obligation of trial and appellate courts to carefully scrutinize issues of voluntary consent to search.[1]

The primary objective of the Fourth Amendment to the United States Constitution is the protection of

---

[1] In *State v. George,* 557 N.W.2d 575, 579–80 (Minn. 1997), the Minnesota Supreme Court expressed its "serious concerns" related to traffic stops and subsequent "voluntary consents" to search. Rather than reject "the concept of consent to search in the context of routine traffic stops" the Minnesota court wrote that "courts can and should demand sufficient proof in an individual case that the consent to search was truly express, clear and voluntary." *Id.* at 580.

every citizen's reasonable expectations of privacy against governmental intrusions. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

It is an overriding principle that "searches and seizures conducted without prior judicial approval are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *La Fournier v. State*, 91 Wis. 2d 61, 66–67, 280 N.W.2d 746, 749 (1979) (quoted source omitted). Consent is one of the rare exceptions to the Fourth Amendment warrant requirement. *See State v. Johnson*, 177 Wis. 2d 224, 233, 501 N.W.2d 876, 879 (Ct. App. 1993). This exception, as all exceptions, to the Fourth Amendment is "jealously and carefully drawn." *See La Fournier*, 91 Wis. 2d at 67, 280 N.W.2d at 749 (quoted source omitted).

When the voluntary consent of an individual is contested, it is the obligation of the court to decide whether in such a situation "a reasonable person would feel free to decline the officer['s] requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). In resolving this issue, the court must look at the totality of the circumstances to determine whether the consent to search was the result of a free, intelligent, unequivocal and specific choice without any duress or coercion, actual or implied. *See State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794, 802 (1998). As is noted in the lead opinion, "voluntariness" requires the court to accommodate complex values: the

police need to be able to seek the cooperation of and ask questions of individuals in order to preserve the safety and security of the community and the individual needs to be able to enjoy reasonable expectations of privacy in person, possessions and premises. *See* majority op. at 238–39; *State v. George,* 557 N.W.2d 575, 579 (Minn. 1997).

Any court's analysis must begin with an understanding of the protections afforded by the Fourth Amendment:

> The purpose of the [Fourth Amendment], in other words, is to preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion "reasonable."

*Minnesota v. Dickerson,* 508 U.S. 366, 380 (1993) (Scalia, J., concurring).

The analysis is made difficult because the voluntariness of consent is not easily defined. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 224 (1973). It can only be found after the court has carefully examined all of the circumstances surrounding the giving of consent, including the nature of the encounter, the kind of person the subject of the request is, the officer's training and experience, and what was said and how it was said.

The statements and actions of the individual are subject to dissection in the court's analysis. It is now established that the individual does not have to be told that he or she can refuse to give consent to a search. *See Ohio v. Robinette,* 519 U.S. 33, 117 S. Ct. 417, 421 (1996). On the other hand, "mere acquiescence on a claim of police authority or submission in the face of a

show of force, of course, is not enough." *George*, 557 N.W.2d at 580 (quoted source omitted).

The court must probe the law enforcement officer's statements and behavior. Although the subjective motivations of the officer are not crucial to a determination of constitutional reasonableness, *see Whren v. United States*, 517 U.S. 806, 812 (1996), the court must consider the officer's training and experience as one factor in the totality of the circumstances. As we recently noted:

> "But the fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean that an [officer's] perceptions are justified by the *objective* facts. The 'basis of the police action must be such that it can be reviewed judicially by an objective standard.' [Citations omitted.]" *United States v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2nd Cir. 1980).

*State v. Young*, 212 Wis. 2d 417, 429, 569 N.W.2d 84, 90 (Ct. App. 1997).

A justice of the Minnesota Supreme Court has observed that a citizen who has "consented" to make a purchase as a result of a sales pitch has more protections under consumer protection laws than a citizen who has "consented" to a search as a result of the subtle tactics used by law enforcement. *See George*, 557 N.W.2d at 581–82 (Tomljanovich, J., concurring).

> We are not dealing with vacuum cleaners in this case but with the liberty and privacy interests of all the people . . . and we have an obligation to ourselves and to the Constitution of this State to do what we can, in our limited role . . . to provide reasonable protection to those interests.

*Id.* at 582.