COURT OF APPEALS
DECISION
DATED AND FILED

October 12, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1666-CR**

Cir. Ct. No. **2018CF314**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

SHANNON M. CARLSON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Fond du Lac County: ROBERT J. WIRTZ, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Shannon M. Carlson appeals from a judgment convicting him of first-degree reckless homicide by drug delivery. He contends that the circuit court erred in denying his motions to suppress certain evidence and statements. For the reasons that follow, we affirm.

¶2      Just before 11:30 p.m. on September 1, 2014, police and paramedics were dispatched to an "ambulance call" for a female who had stopped breathing at Carlson's house in the city of Fond du Lac. The female was Carlson's former girlfriend, J.R.

¶3      James Brooks was the first police officer to arrive at the scene. He was met by Carlson's friend, John Marino, who directed him to the bedroom where J.R. lay unconscious. There, Brooks saw another woman, later identified as Marino's stepdaughter, performing CPR. Paramedics came soon thereafter to take over the CPR. Brooks asked Carlson, "if he knew anything that [J.R.] would have taken that could help the [paramedics] to save her." Carlson replied that J.R. had a history of heroin use.

¶4      Philip Gourdine was the next police officer to arrive. He observed Carlson sitting in the kitchen. Wanting to get as much information as he could for the paramedics, Gourdine asked Carlson if J.R. "had taken something." Carlson replied that he did not know. J.R. was subsequently taken to the hospital by ambulance. She later died from a multi-drug overdose.

¶5      After J.R. was taken away, Brooks asked Carlson whether he knew what J.R. was doing that day and how she got to his house. Carlson explained that J.R. was his former girlfriend and had come over to do laundry. When she was finished, she asked to take a nap. Carlson agreed and left while J.R. took a nap in

his bedroom. Upon returning that night with Marino, Carlson found J.R. in dire condition with foam near her mouth.

¶6 Detective Matthew Bobo arrived shortly thereafter to investigate what had happened. He first interviewed Marino outside the house. Marino told Bobo that, upon finding J.R., Carlson expressed belief that she had suffered a heroin overdose. Carlson then asked Marino to contact his stepdaughter, who was a nurse, to bring some Narcan to administer. Marino told Bobo that Carlson was "a daily user of heroin."

¶7 Bobo next spoke to Carlson outside. Early in the interview, Bobo asked if he could search the house and showed Carlson a consent form to sign. Carlson refused at first because he "did not want to get [J.R.] in any trouble." In response, Bobo told Carlson that he would apply for a search warrant based on the information he had. At that point, Carlson agreed to sign the consent form and did so in the kitchen. The ensuing search yielded used needles, two burnt spoons, a piece of foil, and a metal pipe used for smoking crack.

¶8 After consenting to the search, Carlson told Bobo that he was now "clean" and had not taken heroin for a couple of days. Carlson also talked about J.R.'s drug usage. Bobo described Carlson as sad, caring greatly for J.R., and trying to do what was best for her. Bobo said that "towards the very, very end" of the interview, Carlson started nodding off and had difficulty understanding questions. Bobo believed these were signs of drug withdrawal.

¶9 At the time of the incident, Carlson was on probation. Police contacted probation and parole, which put a probation hold on Carlson based upon the gathered information. Carlson was taken into custody on that hold just after

3

2:30 a.m. Thus, police were at the scene with Carlson for approximately three hours.

¶10　Three days later, on September 4, 2014, Bobo interviewed Marino again. This time, Marino implicated Carlson as providing heroin to J.R. on the day in question. Additionally, Marino said there was heroin inside the house that police had missed during their search. Bobo subsequently obtained a search warrant for Carlson's house that police executed on September 8, 2014.

¶11　Also on September 8, 2014, Bobo and Detective William Ledger interviewed Carlson in jail. After a brief discussion about Carlson's probation status not relevant here, Bobo read the *Miranda*[1] warnings off of his police department's statement of rights and waiver form. Carlson indicated that he understood and signed the form.

¶12　In the ensuing interview, Carlson initially denied any wrongdoing other than possessing the crack pipe. Thirty-four minutes into the interview, after he was confronted with Marino's allegations, Carlson admitted to providing heroin to J.R. on September 1, 2014. The State eventually charged Carlson with several crimes, including first-degree reckless homicide by drug delivery.

¶13　Carlson filed multiple motions to suppress. Specifically, he sought to suppress (1) the evidence obtained in the warrantless search of his house; (2) his statements to police on September 1-2, 2014; and (3) his statements to police on September 8, 2014. Following a hearing on the matter, the circuit court denied Carlson's motions.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

¶14    Carlson ultimately entered an *Alford*[2] plea to the charge of first-degree reckless homicide by drug delivery.  The circuit court sentenced him to six years of initial confinement and six years of extended supervision.  This appeal follows.

¶15    On appeal, Carlson contends that the circuit court erred in denying his motions to suppress.  A circuit court's ruling on a motion to suppress presents a mixed question of fact and law.  *State v. Casarez*, 2008 WI App 166, ¶9, 314 Wis. 2d 661, 762 N.W.2d 385.  The court's findings of fact will not be overturned unless they are clearly erroneous.  *Id.*  However, the application of constitutional principles to those findings of fact presents a matter for independent appellate review. *Id.*

¶16    We begin our discussion with the evidence obtained in the warrantless search of Carlson's house.  Carlson argues that the evidence should be suppressed because his consent was not voluntarily given.

¶17    Consent is a well-established exception to the warrant requirement. *State v. Artic*, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430.  "For a search pursuant to consent to be constitutionally permissible, the consent must be voluntary under the totality of the circumstances and not the product of duress or coercion, express or implied."  *State v. Stankus*, 220 Wis. 2d 232, 237, 582 N.W.2d 468 (Ct. App. 1998).

¶18    Courts may consider multiple factors to determine whether consent to a search was voluntary, including:

---

[2]  *See North Carolina v. Alford*, 400 U.S. 25 (1970).

(1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

*Artic*, 327 Wis. 2d 392, ¶33.

¶19    Examining these factors, we conclude that Carlson's consent was voluntarily given.  Police did not deceive or trick Carlson.  They did not threaten him, physically intimidate him, or deprive him of food or sleep.  While the conditions attending the request to search were no doubt stressful and emotional, that was due to J.R.'s overdose—not police conduct.  Carlson's personal characteristics gave no indication that he was unable to refuse consent.  Indeed, he initially refused consent before changing his mind.

¶20    Carlson suggests that Bobo acted improperly when, in response to Carlson's initial refusal, he said he would apply for a search warrant.  There was nothing wrong about telling Carlson what would happen next.  Furthermore, "[t]hreatening to obtain a search warrant does not vitiate consent if 'the expressed intention to obtain a warrant is genuine … and not merely a pretext to induce submission.'"  *Id.*, ¶41 (citation omitted).  The circuit court found Bobo's statement reasonable under the circumstances.[3]  We agree.

---

[3] The circuit court observed:

(continued)

¶21 We turn next to Carlson's statements to police on September 1-2, 2014. Carlson maintains that suppression is warranted because he did not receive *Miranda* warnings and was suffering from drug withdrawal, which rendered his statements involuntary.

¶22 The warnings prescribed by *Miranda* are required only when a suspect is in custody. *See* *State v. Morgan*, 2002 WI App 124, ¶10, 254 Wis. 2d 602, 648 N.W.2d 23. A suspect is in custody for *Miranda* purposes when his or her "freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (citation omitted).

¶23 The test for custody is an objective one, requiring us to look to the totality of the circumstances. *State v. Dobbs*, 2020 WI 64, ¶54, 392 Wis. 2d 505, 945 N.W.2d 609. Relevant factors include (1) the freedom to leave; (2) the purpose, place, and length of the interrogation; and (3) the degree of restraint. *Morgan*, 254 Wis. 2d 602, ¶12.

---

I find at the time that the police had a reasonable basis to make the statements they did. Officer Bobo had found out that there was a person who was in dire physical straits because of, perhaps, heroin ingestion. Narcan had been administered. A woman was foaming from the mouth. Mr. Carlson said it's heroin-related. And whether it was Mr. Carlson, whether it was somebody else at the house, whether it was the victim … the idea that the police would be able to get information by a search of the house, I think, is reasonable.

So, the fact that the police may have used that inducement of, "Oh, we'll apply for a search warrant," I think, was a reasonable statement and I don't think it was some—some fictitious information. I think there was enough there to make such a request.

7

¶24    We also look to the totality of the circumstances in assessing whether a statement was voluntary. *State v. Vice*, 2021 WI 63, ¶30, 397 Wis. 2d 682, 961 N.W.2d 1. However, we must first examine the threshold matter of coercion. *Id.*, ¶31. Without it, "there is no need for us to engage in the balancing test between the suspect's personal characteristics and those nonexistent pressures." *Id.* *See also State v. Hoppe*, 2003 WI 43, ¶37, 261 Wis. 2d 294, 661 N.W.2d 407 ("Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness.").

¶25    Here, we are not persuaded that Carlson was in custody when he gave statements to police on September 1-2, 2014. As noted, police were at Carlson's house due to an "ambulance call" for a female who had stopped breathing. When they spoke to Carlson, their questioning was neither continuous nor long. It was intended to find out what had happened to the female and what she might have taken that caused her to stop breathing. Carlson never indicated that he wanted to leave, and police did not restrain him until probation and parole placed a probation hold on him. On these facts, we cannot say that *Miranda* warnings were required.

¶26    As for the issue of voluntariness, Carlson only exhibited signs of drug withdrawal "towards the very, very end" of his interview with Bobo. He showed no such signs earlier. At any rate, because there is no evidence of coercive or improper police conduct, Carlson cannot prevail on this claim. *See Hoppe*, 261 Wis. 2d 294, ¶37.

¶27    Finally, we turn to Carlson's statements to police on September 8, 2014. Carlson submits that suppression is necessary because his *Miranda*

warnings were insufficient with respect to his right to counsel and his statements were involuntarily made.

¶28    Again, we look to the totality of the circumstances when considering the validity of a *Miranda* waiver and the voluntariness of a statement. *See State v. Hambly*, 2008 WI 10, ¶91, 307 Wis. 2d 98, 745 N.W.2d 48; *Vice*, 397 Wis. 2d 682, ¶30.    Again, those circumstances persuade us that Carlson's statements should not be suppressed.

¶29    The following is what Bobo told Carlson about his *Miranda* rights before Carlson waived them in writing:

> You have the right to remain silent.  Anything you say can be used against you in court.  If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present you will have the right to stop answering questions at any time.  You also have the right to—at any time to talk with a lawyer.

¶30    Carlson does not convincingly explain what was so confusing about these warnings with respect to his right to counsel.[4]  Collectively, they reasonably conveyed his right to have counsel at his side before, during, and after the interview, which is all that was required. *See Florida v. Powell*, 559 U.S. 50, 60 (2010) (in reviewing the form of *Miranda* warnings given, courts need not examine the words "as if construing a will or defining the terms of an easement"; rather, the inquiry is simply whether the words reasonably conveyed the required rights) (citation omitted).

---

[4] Carlson did not testify at the suppression hearing.  However, the record shows that he was high school educated and had experience in the criminal justice system.  It does not appear that he suffered from any cognitive or mental disabilities.

¶31 Carlson's claim of involuntariness fares no better. He complains that police misled him by telling him they were looking for "bigger fish" drug dealers and that those drug dealers were more responsible for J.R.'s death than he was. Such "commonly accept[ed]" tactics as minimizing do not without more render his statements involuntary. *State v. Moore*, 2015 WI 54, ¶64, 363 Wis. 2d 376, 864 N.W.2d 827. Police made no promises to Carlson to elicit additional information. On this record, we are satisfied that the circuit court properly denied his motion.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2019-20).