STATE of Wisconsin, Plaintiff-Respondent,

v.

Lawrence J. FIELDS, Defendant-Appellant.

Court of Appeals

*No. 00–0694–CR. Submitted on briefs August 9, 2000.—Decided September 6, 2000.*

# 2000 WI App 218

(Also reported in 619 N.W.2d 279.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Daniel R. Goggin II* of *Goggin & Goggin*, Neenah.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *M. Cathleen Huber*, assistant district attorney, Appleton.

Before Cane, C.J., Hoover, P.J., and Peterson, J.[1]

¶ 1. PETERSON, J. Lawrence Fields appeals a judgment of conviction for operating after revocation, second offense.[2] Fields pled no contest to the charge following denial of his motion to suppress evidence on

[1] Upon the court's own motion, and order dated August 31, 2000, this decision is by a three-judge panel.

[2] WISCONSIN STAT. § 343.44(1). All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

the grounds of an unlawful stop of his vehicle. We conclude that the officer lacked reasonable suspicion to stop. We therefore reverse the judgment and remand with directions to grant Fields' suppression motion.

## BACKGROUND

¶ 2. At the suppression hearing officer Alphian Metoxen testified that he was on patrol in a marked squad car. Just before midnight he was driving southbound on Van Boxtel Road approaching the intersection with Ranch Road. Van Boxtel has stop signs at the intersection for both northbound and southbound traffic. Ranch has no stop signs. The intersection is located in a rural area.

¶ 3. When Metoxen was fifty to seventy yards from the intersection, he noticed a northbound vehicle stopped at the stop sign on Van Boxtel. He did not recall if the vehicle had a turn signal flashing. There was no other traffic.

¶ 4. After Metoxen stopped at the stop sign for southbound traffic, the northbound vehicle stayed stopped for five to ten seconds. It then pulled away from the stop sign and Metoxen stopped it. Fields was the driver.

¶ 5. The prosecutor asked Metoxen why he stopped the vehicle. The transcript reads:

Q Why do you do that?

A Reasons for suspicious activity.

Q What did the vehicle do that you thought was suspicious?

A Resting at the stop sign before I got there and then staying there as if waiting for me to go first.

Q Why did you find that to be suspicious?

A Just for the mere fact that it had stopped and there was no reason. There was no traffic. There wasn't a stoplight. It could have gone well before I left.

Q And what then made you think that that was suspicious of any type of potential illegal activity or improper activity?

A Because it just seemed like it was just resting waiting for me to go and then it'd just go the opposite way I'm going.

Q What then was potentially illegal? What did you think that it was—that caused you to think that it might be involved in something that was inappropriate?

A Possibly might be a drunk driver, you know, someone whose license is revoked or suspended, just something out of the ordinary, whether it's first trying to find out, you know, what kind [of] vehicle they got right there.

¶ 6. The prosecutor also asked Metoxen about his experience. Metoxen, who had been a police officer for three years, testified that a vehicle usually stops under these circumstances for several seconds less. The length of time Fields' stopped was unusual. Further, late at night, vehicles regularly try to evade squad cars by traveling in opposite directions, pulling into driveways or making other maneuvers to get out of sight. Past stops in those situations have yielded criminal activity on occasion.

¶ 7. A passenger in Fields' vehicle also testified at the suppression hearing. He contradicted Metoxen in several respects. The trial court found Metoxen more credible and disregarded the passenger's testimony.

¶ 8. The trial court denied the suppression motion. First, it commented that the stop was justified under the community caretaker doctrine. The court thought the delay at the stop sign could mean someone was in need of help, might have a medical condition, or might be under duress. Second, the court thought the circumstances justified suspicion of an intoxicated driver, someone with a guilty mind about driving status, someone trying to hide contraband or conceal himself or herself.

## STANDARD OF REVIEW

¶ 9. When we review a motion to suppress evidence, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *See State v. Eckert*, 203 Wis. 2d 497, 518, 553 N.W.2d 539 (Ct. App. 1996). However, the application of constitutional principles to the facts is a question of law we decide without deference to the circuit court's decision. *See State v. Patricia A.P.*, 195 Wis. 2d 855, 862, 537 N.W.2d 47 (Ct. App. 1995).

## DISCUSSION

██

¶ 10. To execute a valid investigatory stop consistent with the Fourth Amendment prohibition against unreasonable searches and seizures, a law enforcement officer must reasonably suspect, in light of his or her experience, that some kind of illegal activity has taken or is taking place. *See State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990). In Wisconsin the reasonable suspicion standard has been codified in WIS. STAT. § 968.24. The question whether the officer's suspicion was reasonable is a common

sense test: was the suspicion grounded in specific, articulable facts and reasonable inferences from those facts that the individual was committing a crime. *See State v. Waldner*, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). An inchoate and unparticularized suspicion or hunch will not suffice. *See id.* However, the officer is not required to rule out the possibility of innocent behavior. *See State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990).

¶ 11. Before turning to the primary analysis, two issues are quickly dispatched. First, Fields bases much of his appellate argument on the testimony of his passenger. However, the trial court disregarded the passenger's testimony because it conflicted with the more credible testimony of the police officer. The court is the arbiter of credibility. *See Lessor v. Ritchie*, 221 Wis. 2d 659, 667, 586 N.W.2d 1 (Ct. App. 1998). Therefore, we also disregard the passenger's testimony and limit our review to the testimony of the officer.

¶ 12. Second, the judge upheld the stop not only on the basis of reasonable suspicion, but also on the basis of the community caretaker doctrine. The State, however, does not attempt to justify the stop on this basis. That is just as well, since community caretaking functions must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Anderson*, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987). Thus, the stop cannot be upheld on that basis.

*Evasion: Guilty Mind*

¶ 13. Metoxen's primary emphasis in his testimony seemed to be a suspicion that Fields was going to try to evade him. In *Anderson*, our supreme court held that because "flight from the police is a strong indica-

tion of 'mens rea,' i.e., a guilty mind or a guilty purpose, we conclude that behavior which evinces in the mind of a reasonable police officer an intent to flee from the police is suspicious behavior sufficient to justify a temporary investigative stop." *See Anderson,* 155 Wis. 2d at 79. Anderson sighted a squad car in an alley near where he lived, then turned his car away and onto a city street and sped up. The court concluded that "[f]light at the sight of police is undeniably suspicious." *Id.* at 84.

¶ 14. *Anderson* is helpful because it involves actual flight. That factor was important in the decision, as seen by the disagreement between the majority and concurrence over whether flight was actually demonstrated in the record. *See id.* at 91 (Heffernan, C.J., concurring). Thus, while the court approved flight as a basis for a stop, it has never suggested that a temporary pause, which might or might not be preliminary to evasive behavior, is reasonable suspicion of unlawful activity. Here, Fields did not flee or evade. The officer only thought the longer-than-normal stop might be a prelude to evasion. But after Fields pulled away from the stop sign, the officer stopped him immediately.

¶ 15. Another factor in *Anderson* is worthy of mention. Anderson turned his vehicle away when it was clear to the officers that he had observed the squad car. Thus, the court could infer a guilty mind. Here, there is no evidence that Fields knew that he was facing a squad car. The setting for this event was the middle of farm country around midnight. There is no testimony about artificial lighting. While the officer was driving a marked squad, he did not say how it was marked or how Fields would recognize it as a police vehicle in the dark. It cannot be inferred that Fields recognized it as a squad when the vehicle was still fifty

44

to seventy yards from the intersection. And by the time the police vehicle came to a stop at the intersection in the dark, the evidence does not show whether headlights were enough to illuminate the identity of the squad car. The record is thus devoid of any facts from which an inference can be made as to whether Fields could identify the other vehicle as a squad car. Without these facts, there is no basis for the further inference of a guilty mind. Without that underpinning, *Anderson* does not permit the stop.[3]

¶ 16. Even if Fields could identify the squad car by the time it stopped at the intersection, we are only talking about a delay from that point of five to ten seconds. Further, the officer said that a normal stop is only several seconds less. This minimum number of seconds is too scant a basis for inferring a guilty mind.

## *Articulable Facts*

¶ 17. If the facts do not give rise to an inference of a guilty mind, then they must in some other way support an objective basis for suspecting that unlawful activity was afoot. *See State v. Allen*, 226 Wis. 2d 66, 75–76, 593 N.W.2d 504 (Ct. App. 1999). Metoxen posited that the facts might suggest a drunk driver or someone whose license was revoked or suspended. The court also mentioned the possibility of someone trying to hide contraband or conceal himself or herself.

---

[3] In *State v. Haviland*, 532 N.W.2d 767, 769 (Iowa 1995), the court concluded that the driver's conduct was not furtive where the driver "apparently could not see if the approaching vehicle was a police car." The court observed that it did "not know of any case law or other authority which suggests that a private citizen's avoidance of another private citizen as opposed to the police is indicative of criminal behavior." *Id.*

¶ 18. The best the State was able to do for an analogous case is *Waldner*. There the court found reasonable suspicion in the totality of circumstances: traveling at 12:30 a.m. on a main street at a slow rate of speed, stopping at an intersection where there was no stop sign or stop light, turning onto a cross street and accelerating at a high rate of speed, parking and pouring a mixture of liquid and ice from a plastic glass onto the roadway. The court acknowledged that any of these facts standing alone might not suffice. *See Waldner*, 206 Wis. 2d at 58. It further recognized that Waldner did nothing illegal. Nevertheless, "a reasonable police officer . . . cannot ignore the reasonable inference that they might also stem from unlawful behavior." *Id.* at 61.

¶ 19. However, this case is a far cry from *Waldner*. There are far fewer facts here and the inferences require a much greater leap. Professor LaFave has noted that reactions of a suspect are a particularly murky area of the law of reasonable suspicion. He summarizes some of the cases:

> Thus, it has properly been held that the "hesitancy of a car to pass a police cruiser and a glance at the police by a passenger," a "startled look at the sight of a police officer," appearing nervous when a police car passed, looking away from police activity in the vicinity, pointing toward police, driving off at a normal speed or quickening one's pace upon seeing the police are not, standing alone, sufficient bases for an investigative stop. By contrast, such stops have been upheld when the individual made repeated efforts to avoid police contact, when he engaged in a combination of several different possibly furtive actions, and when the person engaged in a rather

extreme means of avoidance such as high-speed flight.

WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(f), at 180–81 (3d ed. 1995).

¶ 20. A closer look at some of these cases is helpful to determine how other courts view analogous scenarios. In *State v. Wiese*, 525 N.W.2d 412 (Iowa 1994), slow driving in the absence of erratic driving, interference with traffic, or the posted limit did not constitute grounds for a stop. In *State v. Brown*, 509 N.W.2d 69 (N.D. 1993), driving at a slower than usual speed did not by itself create reasonable suspicion of driving while under the influence. In *State v. Reynolds*, 899 P.2d 540 (Mont. 1995), waiting seven to ten seconds at an intersection plus "bordering on traveling too fast" did not support a particularized suspicion of wrongdoing. In *Kappel v. Director, DOT*, 602 N.W.2d 718 (N.D. 1999), stopping at a stop sign for ten seconds at 1 a.m., then weaving in the lane of traffic was a sufficient basis to stop. The North Dakota court reached the same result in *State v. Guthmiller*, 499 N.W.2d 590 (N.D. 1993), where an anonymous person reported a drunk driver, described the vehicle and its location, officers then located the vehicle and drove up behind it at a stop sign where the vehicle stopped for a few seconds. The concurrence was careful to point out that the pause at the stop sign, without the anonymous tip, would not have been enough to trigger reasonable suspicion. *See id.* at 593.

¶ 21. These cases support the conclusion that something more was required in order to lawfully stop Fields' vehicle. No doubt Metoxen had a hunch that something was going on. But an investigative stop cannot be based on an "inchoate and unparticularized suspicion or 'hunch' . . . ." *Terry v. Ohio*, 392 U.S. 1, 27

47

(1968). The "Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 120 S.Ct. 673, 676 (2000).

¶ 22. The State, in its argument, relies on Metoxen's training and experience. In *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979), the Court observed that training and experience enables law enforcement officers to perceive and articulate meaning that would not arouse suspicion in an untrained observer. "But the fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean an [officer's] perceptions are justified by the objective facts." *State v. Young*, 212 Wis. 2d 417, 429, 569 N.W.2d 84 (Ct. App. 1997) (quoting *U.S. v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2nd Cir. 1980)). In this case, Metoxen drew inferences based on his experience with vehicles that had tried to evade him. However, Fields never tried to evade Metoxen. Metoxen was only anticipating evasion, so any inference is unsupported by Metoxen's experience.

¶ 23. Based on the totality of circumstances, we simply cannot conclude that Fields' slightly longer than normal stop at the stop sign, at that time and in that location, gave rise to the level of "specific and articulable facts" necessary to justify reasonable suspicion that Fields had committed or was committing an unlawful act. Because the stop was unlawful, Fields' suppression motion must be granted.

*By the Court.*—Judgment reversed and cause remanded with directions.