STATE of Wisconsin, Plaintiff-Respondent,

v.

Jacquese Franklin HARRELL,
Defendant-Appellant.†

Court of Appeals

*No. 2009AP2831–CR. Submitted on briefs August 3, 2010.
—Decided August 24, 2010.*

2010 WI App 132

(Also reported in 791 N.W.2d 677.)

† Petition for Review

480

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. FINE, J. Jacquese Franklin Harrell appeals the judgment entered on jury verdicts convicting him of first-degree reckless homicide while armed, *see* WIS. STAT. §§ 940.02(1) & 939.63, and unlawfully possessing a firearm although a convicted felon, *see* WIS. STAT. § 941.29, in connection with the shooting of Victoria Jackson in the early morning of October 20, 2007. He also appeals the circuit court's order denying his motion for postconviction relief.[1] Harrell claims that the trial court erred in denying his motion to suppress a gun tied to Jackson's death, and, also, that his trial lawyer ineffectively represented him. We disagree, and affirm.

## I.

¶ 2. Jackson died when she was shot while driving a van. The State alleged that Harrell shot her, and presented the following evidence.

---

[1] The Honorable Jeffrey A. Wagner presided over Harrell's trial, and the Honorable Jeffrey A. Conen denied Harrell's motion for postconviction relief.

- John David, one of Harrell's friends, testified that he and Harrell were at a Milwaukee nightspot, then called Remedies but previously known as Magnolia's, when they left the club on October 20th at the 2 a.m. closing in the car David was driving, a Monte Carlo. Harrell was sitting in the front passenger seat. Suddenly, David heard one or two shots coming from inside his car. He looked over at Harrell and saw that Harrell had a gun in his hand. Although David testified that he did not remember in what hand Harrell held the gun, he had previously told a Milwaukee police detective that the gun was in Harrell's right hand. Additionally, although David denied it at the trial, he also told the detective that after the shots, he saw in his rear-view mirror and to his right, a van that was in the right-passenger lane, and that he saw the van swerve. The van, which then crashed into a light pole, was the van Jackson was driving when she was shot.

- One of Jackson's friends, Santana Walker, testified that she spoke with Harrell at around 3:30 a.m. on October 20th, when he called her on her cell phone and asked to get together. Ultimately, they wound up at a house on 25th Street and Burleigh Avenue, where Harrell was "house sitting" for a friend. Walker testified that while at the house with Harrell, she heard Harrell tell a person whom she could not identify:   "I was at [Remedies/Magnolia's] or whatever and I shot an innocent bystander." (Walker's phrasing.) She also agreed with the prosecutor that she had earlier told a police detective that, as phrased by the prosecutor, Harrell had said that some people outside of the club "tried to get beastly with him." She denied telling the detective, however, that Harrell said that he then pulled a gun and started shooting. The detective testified to the contrary:

    Basically she explained that he had been at — I believe it was the old Magnolias and that when he

485

came outside that there was some type of — got into an argument with some other males and that he used the word beastly. We kind of clarified what that word meant. She said like they were getting ready to fight. Before anyone could physically fight, he took out a gun and fired and that an innocent bystander was shot.

- Antwain Childs, another of Harrell's friends, was also staying at the house on 25th and Burleigh. He testified that Harrell went out on the night Jackson was shot, and that before he left he saw Harrell take a gun with him. Childs said it was "[a] nine." He identified the gun tied to Harrell as the gun he saw Harrell take with him. Childs also told the jury that some time around 3 a.m., Harrell returned to the house with "John," who was driving a Monte Carlo; Harrell told Childs that something had gone terribly wrong:

    Q. And did you tell Detective [David] Salazar that [Harrell] said cuz, I think I fucked up. I was telling cuz that you all ain't no killers and I let my window down and took my gun and got to shooting, boom, boom, boom, and a van had an accident?

    A. Yep.[2]

- Police found two nine-millimeter cartridge cases at the scene. The cases and parts of bullets recovered from Jackson's body and van matched the gun tied to Harrell.

¶ 3. We now turn to how the gun was tied to Harrell. This was the subject of Harrell's motion to suppress, which, as we have noted, the trial court denied.

---

[2] Although David told the jury that he did not know if others thought he was Harrell's cousin, a Milwaukee police detective testified that David told him "that some people believed or thinks that [Harrell] is his cousin." No one disputes that the "John" to whom Childs referred is John David.

¶ 4.   Police officers went to the house on 25th and Burleigh on October 21, 2007, looking for Harrell because he was a suspect in the Jackson shooting. One of the officers knocked on the door, and Harrell answered and stepped out. The officer told Harrell that a detective wanted to talk to him and they waited in the officer's car. The police did not arrest or handcuff Harrell at that point, although the officers testified that they would not have let Harrell leave if he had wanted to. When the detective, Gilbert Hernandez, arrived, Harrell was in the officer's car. According to Hernandez, Harrell was getting nervous because folks were gathering near the car, and rather than talk to Hernandez in his squad car, Harrell wanted to go back inside the house. According to Hernandez "there was a group of people out there, and this was the indication — appearance of a snitch. He didn't want to be out there." The officers led Harrell into the house, and Hernandez remained temporarily outside. Harrell was not under arrest or in handcuffs then either.

¶ 5.   One of the officers who led Harrell back into the house testified at the suppression hearing that before he would let Harrell sit on one of the chairs, the officer checked it to make sure there were no weapons that Harrell could get:

Q Why did you check the chair he wanted to sit in?

A Just in case there was any weapons or, you know, anything that is going to hurt any of us that were in the house.

The officer looking beneath the seat cushion found "suspected cocaine." Then:

A There was another chair not far from that chair. [Harrell] started walking over there, and that's when

487

I went over to that chair and checked the cushion, and that's where I found a firearm.

The gun was loaded. The officer's partner testified that they searched the second chair because "this is where we want to sit him now." The gun they found in the second chair was the gun to which the State's evidence tied to the cartridge casings and bullet pieces connected to Jackson's shooting. The chair in which the officers found the gun was about five feet from the chair where they found the suspected cocaine.

¶ 6.   Harrell testified at the suppression hearing, and denied that he asked the officers to go back inside the house. He also testified that he did not give the officers permission to search the house. Harrell told the trial court that the officer searched the first chair before he would let Harrell sit on it; they let him sit in the chair after they found the suspected cocaine; and that they then searched the couches and other chairs in the room, which was when they found the gun.

¶ 7.   As noted, the trial court denied Harrell's motion to suppress the gun. It ruled that the officers were more credible than Harrell. The trial court thus found that Harrell asked to go back into the house to speak to the officers. The trial court also determined that the officers did nothing wrong by checking the chairs for weapons.

## II.

A. *Suppression of the gun.*

¶ 8.   As we have seen, Harrell claims that the trial court erred in not preventing the jury from learning that the gun tied to Jackson's shooting was found underneath the seat cushion. This presents mixed ques-

tions of fact and law. *See State v. Casarez*, 2008 WI App 166, ¶ 9, 314 Wis. 2d 661, 668, 762 N.W.2d 385, 388. We will not overturn the trial court's findings of fact unless they are clearly erroneous. *Ibid.*; Wis. Stat. Rule 805.17(2) (made applicable to criminal proceedings by Wis. Stat. § 972.11(1)). The trial court is thus the sole judge of the credibility of the witnesses testifying at the suppression hearing. We review *de novo*, however, the trial court's application of constitutional principles. *See Casarez*, 2008 WI App 166, ¶ 9, 314 Wis. 2d at 668, 762 N.W.2d at 388–389. We now turn to whether the officers were justified in looking under the cushion of the second chair.

¶ 9.   The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoted source omitted). Thus, " 'searches and seizures inside a home without a warrant are presumptively unreasonable.' " *Id.*, 466 U.S. at 749 (quoted source omitted). This "presumption," of course, may under appropriate circumstances, be overcome:   "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *United States v. Knights*, 534 U.S. 112, 118–119 (2001) (quoted source omitted).

¶ 10.   *Terry v. Ohio*, 392 U.S. 1, 27–28 (1968), recognized that under the Fourth Amendment's ban

against unreasonable searches and seizures, a law-enforcement officer may search a person to ensure the officer's safety if the officer has reason to believe that the person may have committed a crime and that the person may be "armed and dangerous." "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*, 392 U.S. at 27. Although *Terry* does not permit officers to enter houses without authorization in order to investigate suspicious activity, *State v. Stout*, 2002 WI App 41, ¶ 15, 250 Wis. 2d 768, 780–781, 641 N.W.2d 474, 479, it does permit them to protect themselves from threats of immediate danger once they are lawfully in a house, *id.*, 2002 WI App 41, ¶ 24, 250 Wis. 2d at 786–787, 641 N.W.2d at 482 ("These safety concerns may arise wherever an officer legitimately encounters an individual, whether in a public place or in a private residence or hotel room."). Thus, if officers have a "reasonable suspicion" that a person may have access to a weapon, a limited search is permitted. *Id.*, 2002 WI App 41, ¶ 26, 250 Wis. 2d at 788, 641 N.W.2d at 482. This is especially true, somewhat paradoxically, in the home, where "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' " *Maryland v. Buie*, 494 U.S. 325, 333 (1990). Thus, the police may lawfully search an area from where an arrestee might grab a weapon, but not beyond it. *Chimel v. California*, 395 U.S. 752, 763, 768 (1969). Given *Terry*'s recognition of the need for officer safety, this analysis also applies where the officers are lawfully in the home and are reasonably concerned that the person to whom they are talking can do them harm, even though he or she has

not yet been arrested. *See Terry*, 392 U.S. at 27; *Stout*, 2002 WI App 41, ¶¶ 24–26, 250 Wis. 2d at 786–788, 641 N.W.2d at 482.

¶ 11.  Harrell does not dispute that the officers went to where they believed Harrell was staying because they suspected that he was involved in the Jackson shooting. Thus, the two aspects of *Terry* were satisfied:  (1) the officers suspected that Harrell had committed a violent crime; and (2) reasonable prudence dictated that they keep Harrell from having possible access to a gun. Although he asserts that the officers were not lawfully in the house, the trial court found that by virtue of Harrell's house-sitting status, he could and did give them permission to continue their questioning of him inside the house. Those findings are not clearly erroneous. *See State v. Pickens*, 2010 WI App 5, ¶ 39, 323 Wis. 2d 226, 244–245, 779 N.W.2d 1, 10 (Ct. App. 2009) (common dominion authorizes person to give consent for search).

¶ 12.  Once the officers found the suspected cocaine, of course, they could also legitimately search the area near Harrell as an incident to Harrell's pending arrest, as well as to ensure their safety when they directed him to sit in the second chair. *See Chimel*, 395 U.S. at 763 ("A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."); *see also State v. Dearborn*, 2010 WI 84, ¶ 27, 327 Wis. 2d 252, 267, 786 N.W.2d 97, 105 (automobile search); *State v. Denk*, 2008

WI 130, ¶ 33, 315 Wis. 2d 5, 18, 758 N.W.2d 775, 782 ("[W]arrantless search 'may be incident to a subsequent arrest if the officers have probable cause to arrest before the search.' ") (quoted source omitted).

B. *Alleged ineffective representation by Harrell's trial lawyer.*

¶ 13.   Harrell complains that his trial lawyer represented him ineffectively in four respects, which, after we set out the standards that govern our review, we address in turn.

¶ 14.   To establish ineffective assistance of counsel, a defendant must show:   (1) deficient representation; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient representation, a defendant must point to specific acts or omissions by the lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Id.*, 466 U.S. at 687. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. This is not, however, "an outcome-determinative test. In decisions following *Strickland*, the Supreme Court has reaffirmed that the touchstone of the prejudice component is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding funda-

mentally unfair.' " *State v. Smith*, 207 Wis. 2d 258, 276, 558 N.W.2d 379, 386 (1997) (citations and quoted source omitted).

¶ 15.   Further, we need not address both aspects of the *Strickland* test if the defendant does not make a sufficient showing on either one. *See Strickland*, 466 U.S. at 697. Finally, our review of an ineffective-assistance-of-counsel claim presents mixed questions of law and fact. *See State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990). A circuit court's findings of fact will not be disturbed unless they are clearly erroneous. *Ibid.* Its legal conclusions whether the lawyer's performance was deficient and, if so, prejudicial, are questions of law that we review *de novo*. *Id.*, 153 Wis. 2d at 128, 449 N.W.2d at 848.

1.

■■■■

¶ 16.   Harrell claims that his trial lawyer did not "effectively impeach" David, the driver of the car from which David said Harrell fired his gun. (Uppercasing omitted.) He contends that his trial lawyer should have impeached David with an earlier conviction, proof of which Harrell establishes by a copy of an entry from the Wisconsin Circuit Court Access website. David's conviction was, however, for disorderly conduct, a misdemeanor. This is hardly the substance of earth-shattering impeachment, assuming that the trial court would have even permitted its use for that purpose under Wis. Stat. Rule 906.09. Given the testimony by both Walker and Childs that Harrell admitted to the shooting, Harrell has not, at the very least, shown *Strickland* prejudice.

¶ 17.   He also claims that David should have been impeached because the police had arrested him for the Jackson killing and he thus had the motive to:

(1) minimize his own culpability, (2) maximize Harrell's culpability, and (3) curry favor with the State. Here again, the testimony by both Walker and Childs demonstrates that Harrell has not shown the requisite *Strickland* prejudice.

¶ 18. Finally, he claims that in light of David's testimony at Harrell's preliminary examination that David drank "about" ten drinks of "Hennesey" at Remedies/Magnolia's before he and Harrell drove away, his trial lawyer should have impeached "David's ability to observe the alleged shooting." We disagree. First, although David was most likely impaired and should not have been driving, he was obviously able to at least rudimentarily manipulate the controls of his car. Second, as the State points out, it would not take much observational ability for a driver to know if someone was shooting a gun out of the front-passenger window. Harrell has not shown *Strickland* prejudice in connection with this complaint either.

2.

¶ 19. Harrell also claims that his lawyer was ineffective because she did not point out to the jury that Childs was on parole when he was first interviewed by the police. Harrell claims that this was a "clear motive to falsify testimony." The motive, however, cuts both ways —Childs would certainly be in trouble if he lied to the police, and Harrell has not indicated how the motive he posits outweighs the motive to be honest. He has not shown *Strickland* prejudice.

## 3.

¶ 20. Harrell contends that his lawyer ineffectively represented him by not pursuing an alibi, and refers to an affidavit from Jarvis Brent, who avers that he was with Harrell continuously from "around 8:00pm" on "[t]he night before Jacquese Harrell was arrested" until Harrell left with Brent's cousin sometime after "around 3:00–4:00am." As the State points out, however, David testified that he was with Harrell at Remedies/Magnolia's until 2 a.m., and Childs testified that he was with Harrell at the house on 25th and Burleigh the evening of October 19th and the morning of October 20th until Harrell left. Harrell's trial lawyer did not ineffectively represent him by not calling Brent as a witness because in light of all the other evidence, not calling Brent does not weaken our confidence in the reliability of the jury's verdicts.

## 4.

¶ 21. Harrell also argues that his trial lawyer ineffectively represented him because the lawyer did not object to what Harrell says was "inadmissible hearsay" by the detectives in connection with what Walker, Childs, and David told them. As we have seen, however, those aspects of the detectives' testimony either conflicted with the witnesses' in-court testimony or were elicited by the State in response to the witnesses' claimed lack of memory. In either instance, the testimony was admissible under WIS. STAT. RULE 908.01(4)(a) ("Prior statement by" a "declarant [who] testifies at the trial . . . and the statement is:   1. Inconsistent with the declarant's testimony."). *See Vogel v. State*, 96 Wis. 2d 372, 391–392, 291 N.W.2d 838, 848 (1980) (purported

lack of memory); *see also State v. Rockette*, 2006 WI App 103, ¶¶ 18–27, 294 Wis. 2d 611, 623–628, 718 N.W.2d 269, 275–277 (lack of memory) (post-*Crawford v. Washington*, 541 U.S. 36 (2004)) (confrontation-clause analysis). Whatever bleed-over there might have been with aspects of the witnesses' testimony that were not inconsistent with what the witnesses told the detectives and the detectives related to the jury, Harrell has not shown *Strickland* prejudice because that bleed-over merely showed context.

¶ 22.  Finally, Harrell claims that all the alleged instances of what he contends was his lawyer's deficient representation add up to *Strickland* prejudice. *See State v. Thiel*, 2003 WI 111, ¶ 60, 264 Wis. 2d 571, 605–606, 665 N.W.2d 305, 322. We disagree. Either separately, as we have already seen, or taken together, the actions by Harrell's trial lawyer about which Harrell complains do not "undermine [our] confidence in the outcome of" the trial. *See id.*, 2003 WI 111, ¶ 60, 264 Wis. 2d at 605, 665 N.W.2d at 322.

C.  *Interests of Justice.*

¶ 23.  Harrell also makes a catch-all contention that his trial lawyer's combined deficient representation also entitles him a new trial in the "interests of justice." We disagree.

¶ 24.  Under Wis. Stat. § 752.35, we may order a new trial if it appears from the Record that:  (1) "the real controversy has not been fully tried" or; (2) "it is probable that justice has for any reason miscarried." *Vollmer v. Luety*, 156 Wis. 2d 1, 16, 456 N.W.2d 797, 804 (1990). This discretionary reversal, however, is reserved for "exceptional cases." *State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662, 667 (1983). Given the overwhelming evidence of Harrell's guilt, this is not such a case.

Further, Harrell's call for a reversal in the interests of justice merely repeats those contentions that we have already rejected. Accordingly, we decline to order a new trial. *See State v. Arredondo*, 2004 WI App 7, ¶ 56, 269 Wis. 2d 369, 405, 674 N.W.2d 647, 663–664 (Ct. App. 2003).[3]

*By the Court.*—Judgment and order affirmed.

---

[3] Harrell does not argue the effect, if any, of the apparent discrepancy between the testimony of David and Walker as to where Harrell fired the shots that hit Jackson even though Harrell's trial lawyer referred to the apparent inconsistency in her closing argument: "Sounds like the prosecution has got two different theories here. Either there's a fight outside the bar . . . or there's a shooting in the street." Accordingly, we do not discuss that possible issue. *See Vesely v. Security First Nat'l Bank of Sheboygan Trust Dep't.*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985) (We will not address arguments that are not developed.).